IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JOHN CURTIN, | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION FILE NO.: |
| v. | : |
| | : **JURY TRIAL REQUESTED** |
| EMORY UNIVERSITY, | : |
| | : |
| Defendant. | : |

## COMPLAINT

Plaintiff, John Curtin, ("Plaintiff" or "Mr. Curtin"), files this Complaint against Defendant, Emory University, ("Defendant" or "Emory"), alleging as follows:

## INTRODUCTION

1. Mr. Curtin was formerly employed by Defendant as a track coach.

2. Mr. Curtin is 68 years old.

3. Mr. Curtin brings this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Plaintiff asserts a claim for age discrimination under the ADEA. Plaintiff seeks injunctive and declaratory relief, back pay and lost benefits, front pay or reinstatement to a full-time position

with commensurate benefits, liquidated damages, and attorneys' fees and costs of litigation.

## JURISDICTION AND VENUE

4. Jurisdiction of this court is invoked pursuant to 42 U.S.C. § 2000(e)-5(f)(3), 28 U.S.C. § 1331 (Federal question) and 28 U.S.C. § 1343 (civil rights).

5. The unlawful violations of Plaintiff's civil rights were committed within the Northern District of Georgia. This court is an appropriate venue for all of Plaintiff's claims under 28 U.S.C. § 1391(b) because all the parties reside within the Northern District of Georgia and all or a substantial majority of the events giving rise to Plaintiff's claims occurred in this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff satisfied all administrative prerequisites to perfect his claims under the ADEA. Specifically, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a notice of right to sue.

7. Plaintiff brings this suit within ninety (90) days of receipt of his notice of right to sue subject to a tolling agreement entered into between Plaintiff and Emory.

## THE PARTIES

8. Mr. Curtin is a citizen of the United States and resides in the Northern District of Georgia.

9. Mr. Curtin was an "employee" of Defendant within the meaning of the Age Discrimination in Employment Act.

10. Defendant is a nonprofit corporation registered to do business in the State of Georgia and is therefore subject to the court's jurisdiction.

11. Defendant is an "employer" within the meaning of the ADEA, 29 U.S.C. § 630.

12. Defendant is a covered employer under the ADEA.

13. Defendant may be served with summons and a copy of the complaint in this action by delivering process to its registered agent for service of process, Amy Adelman, at 312 Administration Building, 201 Dowman Drive, Atlanta, GA 30322.

## STATEMENT OF FACTS

### *Factual Background*

14. Coach Curtin is 66 years old and began working for Emory in 1985. Over his more than 33 years with Emory, he maintained an unblemished record while providing excellent coaching and mentorship to both male and female student athletes. His nationwide reputation for coaching is extraordinary. Among his many

achievements, he has been selected as Region Coach of the Year in cross-country and indoor and outdoor track by the U.S. Track Coaches Association, and he and his assistants were selected as "Coaching Staff of the Year" on over 21 occasions by the University Athletic Association. Under his guidance, Emory's track and field and cross-country teams have reached their highest-ever levels of performance at regional and national competitions. Even more important than these athletic accomplishments, Coach Curtin's character as an evenhanded, ethical, and respected mentor is unparalleled; his students have looked to him as a mentor and model of responsibility and moral guidance.

15. Over the course of his long career at Emory, many changes have occurred with respect to faculty obligations in reporting incidents of alleged sexual assault on campus under 20 U.S.C. §1681, commonly known as "Title IX." While Emory nominally maintains a policy that certain individuals are "responsible employees" who are required to report anything that could possibly be a Title IX violation, in reality Emory has provided inadequate and sporadic training on Title IX that woefully underprepared its coaches to manage the complexities of real-life situations. This lack of training left Coach Curtin in as especially difficult situation as the coach of a coed sports team responsible for both male and female students. Nevertheless, he successfully and consistently met his obligations under Title IX

throughout his tenure, even while dealing with the additional stress of having to direct the track and cross-country programs without any support.

16. In the Fall Semester of 2018, two female athletes came to Coach Curtin to talk to him about a sexual encounter they had with a male teammate. The female students came to Coach Curtin because the male student had been heard openly recounting the encounter to other team members. They were adamant that they did not wish to report the incident to the University but wanted to handle the situation privately. The students' parents agreed and indicated that they wished to handle the situation with family, and Coach Curtin agreed to support them however they wished to proceed. Coach Curtin was placed in the extraordinarily difficult situation of wanting to respect the wishes of the students who came to him in confidence, while being unsure whether the incident merited reporting to the Title IX Coordinator. Ultimately, as a father of a daughter himself, he decided to respect his students' and their parents' wishes with regard to reporting the incident; however, he suspended the male athlete from the team.

17. Two months had passed and the young women and the team were moving on from the incident when a former female athlete who had heard of the encounter reported the incident to the Title IX coordinator, who launched an investigation. While this investigation was going on, Coach Curtin was put on 3

months' paid leave and was handed an exhaustive list of persons he could not speak to during the investigation, including former and current athletes, coaches and colleagues. Rumors began to spread that Coach Curtin had himself assaulted someone, permanently affecting his reputation at the school and in the sport. At the end of the investigation, Emory terminated Coach Curtin's employment for allegedly "refusing to fully cooperate with an Emory Investigation" and supposed "inappropriate, or irregular behavior affecting students and employees." This was especially devastating because Athletic Director Dr. Michael Vienna had told Curtin in a meeting Tuesday Nov. 6th that "you will serve a suspension, but this should not cost you your job."  In addition to losing his position, Emory informed Coach Curtin that he was to "refrain from visiting the WoodPec in the future," thus banning him from the athletics facility where he had spent his career. He was initially offered no severance or other benefits.

18. These extreme sanctions are wildly disproportionate to any allegedly improper conduct on the part of Coach Curtin. Coach Curtin clearly did not act with nefarious or inappropriate intent in any way—in fact, he was trying to respect the wishes of the very individuals who came to him seeking his help. Even so, he addressed the male student's behavior directly by suspending the student from the team. To the extent that any action was necessary, this situation could, and should,

have been handled with additional and more adequate training. Instead, Emory's summary termination of a coach with such an established stature has in effect ended the man's career, caused irreparable damage to his reputation, and has cast a cloud of suspicion over his more than three decades of excellent service to the students of Emory University.

19. Prior to these events, on several occasions, Coach Curtin heard the Athletics Director of Emory, Dr. Michael Vienna, reference the fact that he could pay two younger coaches for what he pays Coach Curtin. Mr. Vienna has also engaged in a consistent pattern of hiring younger coaches. In fact, after Coach Curtin was fired, Emory did elevate two younger coaches, both in their mid-to late-20's, and is paying them significantly below what Coach Curtin was paid. It appears that Emory seized upon the opportunity presented by the above incident to terminate Coach Curtin and hire younger employees—just as the Athletics Director had indicated.

20. Ironically, the above investigation apparently cleared the male student who allegedly assaulted the female students, as he remained in school—which means that Coach Curtin was fired over an incident that Emory's own investigation concluded did not happen.

21. The two women complained to Mr. Curtin after they learned their teammate bragged about sex with them to his other teammates. Mr. Curtin discussed the matter at length with them and their parents. All concerned considered it a private matter and did not want it taken further. Neither woman alleged that the male teammate had committed a sexual assault or that the sex was nonconsensual. Their only concern was that the male athlete had told others about it.

22. Shortly after being told about this, Mr. Curtin discussed the matter with his Athletic Director and manager, Mike Vienna, who gave him no guidance whatsoever on what to do and did not report the conduct himself. He had handled a similar matter the same way with younger coaches who failed to report sexually disgusting comments made by a trainer to a number of female athletes, which in turn were reported to several supervisors, none of whom took it to the Title IX office. None were disciplined. This will be discussed in further detail below.

### *Conduct Reported to Mr. Curtin*

23. The first woman athlete reported consensual sexual intercourse to Mr. Curtin followed by a rather strange series of events which, though peculiar, were not characterized as nonconsensual and which both women asked to be kept private. The first woman complained that a male athlete was bragging about having sex with her after a party at his apartment. She told Mr. Curtin that after having sexual

intercourse with the male athlete, she walked back to the dormitory with him and took him to her best friend's room where she left him. He and her friend then proceeded to have sexual intercourse. Mr. Curtin knew nothing about the event, nor of the party that preceded it, until he learned, through the two women, that the young man, who was on the male cross country team, bragged about having had sex with the two women during a bus ride with his teammates. The two women heard about this, were embarrassed, and reported it to Mr. Curtin. They then got their parents involved, who asked Mr. Curtin not to take the matter further and said that it was a private matter and they wanted it treated as such. The incident was embarrassing, but *no one said they were sexually assaulted or attacked or characterized the sex as nonconsensual*.

24.     It is worth noting that in May of 2020, the Department of Education published new regulations on campus sexual assault which allow coaches and other employees who were previously characterized as "mandatory reporters" to "respect the autonomy of students" who might not want their information shared or to initiate a formal investigation. It goes on to state that student autonomy can be respected for students who report Title IX violations merely for "receiving emotional support without desiring to 'officially' report." Here though, no Title IX violations were reported. Rather, the student communications to Mr. Curtin were not efforts to

officially report a matter, and that matter was consensual but embarrassing and private. The two women reported a male student mouthing off about his sexual exploits with them, but asked, with their parents' input, that their privacy be respected and that they not be put through the trauma of an investigation. Coach Curtin respected their wishes.

### *Mr. Curtin Reports the Incident to The Athletic Director, Mike Vienna*

25.     Nonetheless, Mr. Curtin took the matter to his Athletic Director, Mike Vienna, who did not tell him that he should take it to the Title IX office and did not tell him he should take it further at all.  Indeed, if Mr. Vienna had thought there was a sexual assault, then *he* should have taken it to the Title IX office.  He did not. Mr. Curtin did what he thought he should do under unusual circumstances; he reported it to his superior and sought guidance.  Mr. Vienna gave him none.

### *Vienna Had Asked Mr. Curtin When He Would Retire*

26.     However, Mr. Vienna had asked Mr. Curtin repeatedly when he was planning to retire.  Indeed, he had told him at one point that he could replace Mr. Curtin, who was age 66, with younger, less expensive coaches.

### *Prior Title IX Incident Where Younger Mandatory Reporters Failed to Report Sexually Offensive Conduct*

27.     This is not the only time that alleged sexually inappropriate behavior has been reported to Mike Vienna, the Athletic Director.  Approximately 3 years

10

ago, Jenny McDowell, the Head Volleyball Coach, came to him after receiving multiple complaints that an athletic trainer had been making disgusting derogatory sexual comments to female athletes. The comments were so offensive that the women refused to go into the room occupied by the trainer. She first informed the Head Athletics Trainer, John Dunham, of the comments. Nothing occurred. She then complained to Joyce Jaleel, Senior Associate Athletic Director. She told her she did not want the trainer working with the team. Nothing changed.

28. So, she went to Mr. Vienna and told him she was not putting up with it. He told her that he told Joyce Jaleel and John Dunham to handle it. She told him nothing had happened. Rather than terminate the trainer, or Mr. Dunham or Ms. Jaleel, the trainer was simply switched with another trainer. Later, the trainer just stopped showing up for work. He is now working for another college, his career not having been impacted. Ms. McDowell filled out an end-of-the-year evaluation and related the incident and her disappointment. She related that the trainer had made sexual comments to female athletes. Only upon reading this did Mr. Vienna then report the matter to Campus Life, apparently because it had now been documented. At that point, the Title IX office started an investigation. All the players were interviewed, Ms. McDowell was interviewed. Everyone kept their jobs, even the

people who had failed to report the harassment. All were significantly younger than Mr. Curtin.

### *The Contrasting Treatment of Mr. Curtin*

29.     By contrast, Mr. Curtin, age 66, lost his job and had his career ruined as a result.  But before that occurred, he was placed on leave and restricted from discussing the matter with anyone, including other coaches at other institutions as well as at Emory, despite his suspension the day before the Regional Championships. This left the reasons for his not being with his team to rumor and innuendo that devastated his reputation of over 41 years of coaching and eliminated the possibility of him finding another position coaching the sport. Of interest, the young man, who Emory now claims committed a sexual assault, was allowed to go on with his senior year at Emory without interruption and graduate with his class.

30.     Every time a college student has sex, either on campus or off, it is not a sexual assault.  Nor, is it sexual harassment.  If a college student talks about having had sex, that does not make it a sexual assault either.  In this instance, two female athletes related to Mr. Curtin that they had sex with a young man only after he embarrassed them by talking about it on a bus trip.  Mr. Curtin listened carefully to what they said, which did not include any allegation of non-consensual conduct, much less an "assault," and spoke with their parents about it as well.  The consensus

of all is that nothing illegal had happened, and that the matter was merely embarrassing and should be handled privately by the families. Both families emphasized that they *did not* want the incidents of that evening reported.

31.     The only reason that the Title IX complaint was ever made was because somebody else reported the incident through a person at the University who, in turn, reported it to Emory's Title IX office. That launched the investigation.

32.     With respect to the two different incidents described above, one which involved a serial sexual harasser and significantly younger employees who failed to report it, and the other which involved no sexual harassment and no sexual assault at all, the discipline was different. In one, involving younger coaches in their 30s and 40s to whom a report was made of repeated sexually unwelcome conduct, there was no disciplinary action for coaches who did not report the conduct. In the other, which involved consensual conduct, the coach who did not report the conduct, because the students and their parents asked that he not, was given the ultimate sanction, termination. The only difference here is that the terminated employee was 66 years old, substantially older than the other employees who were allowed to retain their jobs.

## COUNT ONE
## AGE DISCRIMINATION IN VOLATION OF THE ADEA

33. Mr. Curtin incorporates by reference all of the preceding paragraphs of the complaint.

34. At the time of his termination, Mr. Curtin was 66 years old and, at all relevant times, was an employee protected by the ADEA.

35. At the time of his termination, Mr. Curtin was more than qualified for the position he held, having performed the same or similar positions over the course of his 41-year career.

36. Mr. Curtin's supervisors, including but not limited to Athletic Director Michael Vienna, harbored a discriminatory animus toward older employees and openly made ageist remarks to employees.

37. Mr. Vienna and others at Emory University discriminated against Mr. Curtin in violation of the ADEA by taking adverse action against him, including, but not limited to, terminating his employment.

38. Mr. Curtin was replaced by a younger individual or individuals outside of his protected class.

39. In terminating Mr. Curtin's employment, Emory knowingly and intentionally discriminated against him on account of his age.

40. In taking these adverse actions against Mr. Curtin, Emory unlawfully discriminated against him on the basis of his age in violation of the ADEA.

41. Mr. Curtin is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees and all other appropriate damages, remedies and other relief available under the ADEA and all Federal statutes providing remedies for violations of the ADEA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury and that the following relief be granted:

A. That this court take jurisdiction of this matter;

B. That process be served;

C. That Plaintiff be awarded a declaratory judgment that Defendant violated the ADEA;

D. That this court enter a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices in violation of the ADEA;

E. That the court award Plaintiff back pay and all benefits, privileges and rights previously denied under the ADEA;

F. That Plaintiff be reinstated to his former position with Defendant at the same pay rate, or in the alternative, front pay to compensate Plaintiff for lost future wages and benefits;

G. That the court award Plaintiff liquidated damages under the ADEA for Defendant's willful violation of the law;

H. That the court award Plaintiff his costs in this action and reasonable attorneys' fees;

I. That the court grant to Plaintiff the right to have a trial by jury on all issues triable to a jury; and

K. That the court grant such additional relief as the court deems proper and just.

Respectfully submitted this 22nd day of July, 2021.

                BUCKLEY BEAL, LLP

By: /s/ *Edward D. Buckley*
     Edward D. Buckley
     Georgia Bar No. 092750
     edbuckley@buckleybeal.com
     J. Kyle Brooks
     Georgia Bar No. 773561
     kbrooks@buckleybeal.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100

Facsimile:  (404) 781-1101

*Attorneys for Plaintiff*